665 P.2d 727

**The IDAHO COMPANY, a limited partnership, dba Beaver Creek Ranch by its general partners John Train, Francis Cabot and William E. Anderson II, Plaintiffs-Respondents,**

v.

**Virgil JAHNKE, Defendant-Appellant.**

No. 14553.

Supreme Court of Idaho.

June 23, 1983.

Dwight E. Baker of St. Clair, Hiller, Wood & McGrath, Idaho Falls, argued for defendant-appellant.

C. Timothy Hopkins of Hopkins, French, Crockett & Springer, Idaho Falls, argued for plaintiffs-respondents.

BISTLINE, Justice.

The Idaho Company (hereinafter Beaver Creek), a limited partnership doing business as Beaver Creek Ranch, owned and operated a 7,000 acre ranch near Dubois, Idaho, called the Beaver Creek Ranch. Tom Devine was appointed in 1976 to manage the ranch and was authorized by the general partners to act on behalf of the partnership for the purpose of liquidating the partnership by operating or leasing the ranch until it could be sold. Mr. Devine's duties included negotiating leases, paying bills, managing the ranch properties and selecting tenants.

In 1977 the entire ranch was leased by Beaver Creek through Tom Devine to Wallace Robinson. Robinson farmed about 2,000 acres himself and subleased the bal-

ance of the ranch to five subtenants. In 1978 the entire ranch was again leased, but during this period there were several tenants including Robinson. Although the record contains no written lease between Beaver Creek and Robinson, the evidence established that Robinson did, in fact, lease approximately 2,005 acres from Beaver Creek in 1978.

During the spring of 1978, as Robinson prepared to plant his grain and potato crops, he began to have financial difficulties and contacted Virgil Jahnke for financial assistance. Jahnke initially guaranteed a fertilizer bill on behalf of Robinson and he continued to provide financial assistance to Robinson during the planting season. In late April of 1978 it became apparent to Robinson that he could not continue with the expenses of the farming operation. Robinson and Jahnke discussed the possibility of Jahnke taking over the operation of the ranch and eventually he did so.

Robinson advised Tom Devine on April 21, 1978, that Jahnke might be interested in taking over his farming operation at the ranch. Thereafter, Devine forwarded a copy of a written lease to Jahnke for his review, which lease contained terms generally equivalent to those offered to all other tenants of Beaver Creek Ranch. Devine and Jahnke first met in person at an equipment sale held at the ranch on May 1, 1978. However, there were no discussions at that time regarding Jahnke's desire to lease acreage at the ranch or regarding the terms of a lease.

By June 1, 1978, all crops had been planted by Robinson's employees under the direction and control of Robinson.

On June 8, 1978, nematode [1] was found in a potato in cellar No. 11 on the ranch, a cellar which may have contained potatoes grown on Beaver Creek Ranch. This event was brought to the attention of Robinson, who on the same day or the following day brought it to the attention of Devine. Although Devine had previously been informed about nematode found in potatoes from other ranches in the area, this constituted the first indication that there might have been nematode in the soil on Beaver Creek Ranch. On June 16, 1978, the laboratory at which the potato was tested confirmed that it was infected with nematode.

On June 19, 1978, Robinson, Devine and Neil McSpadden met to discuss the nematode problem, and it was decided that all tenants should be notified immediately and requested to withdraw their seed potato crop from certification. Within two days thereafter all Beaver Creek lessees, including Robinson, were informed of the problem. Robinson, who had paid a fee when he applied for certification of the seed potato crop he was growing, thereafter voluntarily withdrew his application and the fee was returned to him. Jahnke learned of the nematode problem in late June from Robinson and Neil McSpadden, and he also learned of the withdrawal of the seed potato crop from certification at that time.

On July 10, 1978, Jahnke and Devine met to discuss the lease which Devine had proposed. Prior to that time Jahnke had taken over Robinson's farming operation and paid Robinson for his expenses; however, Jahnke had not communicated with Devine regarding the terms under which the farm would be leased. On July 10, 1978, the parties also briefly discussed the nematode problem at the ranch. Jahnke refused to sign the lease due to several objections, the primary one being the manner in which the parties were to handle the loss of certification of the 1978 crop of potatoes. Devine explained that he was offering to reimburse all tenants at the ranch for the additional cost of planting virus-tested seed if they would withdraw their crops from certification. However, Jahnke requested that he be compensated by being paid the difference between whatever price he would ac-

---

1. Nematode is defined as "any of a class or phylum (Nematoda) of elongated cylindrical worms parasitic in animals or plants or free-living in soil or water." Webster's New Collegiate Dictionary 769 (1977). A nematode infesta-tion on property used to raise seed potatoes is disastrous because it results in loss of certification of the potatoes, which certification is essential to the marketing of seed potatoes.

tually receive for his potatoes and the price he would have received for certified potatoes.

Although the lease was not signed on July 10, 1978, after that date Beaver Creek regarded and treated Jahnke as a lessee and Jahnke considered himself to be the same. Beaver Creek allowed Jahnke to continue his farming operations without a written lease and Jahnke voluntarily refrained from seeking certification for his potato crop. At oral argument it was conceded that a landlord/tenant relationship had been established on July 10, 1978, there being in existence an implied in fact contract which contained many of the terms found in the lease originally proposed by Devine.[2]

This action arose out of a complaint filed by Beaver Creek, stating a claim for rental payments due on a written lease. Jahnke answered, denying that the parties had reached an express agreement, and counterclaimed for loss due to the nematode problem. Trial was held before the court sitting without a jury. The court found that an implied in fact contract existed between the parties. After an accounting, the court issued a judgment in favor of Beaver Creek in the sum of $79,565.27, plus interest and costs, allowing a credit to Jahnke in the sum of $5,130 for the cost of planting virus-tested seed. Jahnke appeals from that decision.

Succinctly stated, the only issue raised on appeal is whether the trial court erred in finding that the parties had agreed, expressly or impliedly, that Jahnke's credit for the loss of certification for the potatoes would be $5,130. Accordingly, we must determine whether there is substantial and competent evidence to support the trial

court's finding. A review of the record demonstrates that such evidence exists.

Although Devine had sent a copy of a proposed lease to Jahnke, prior to July 10, 1978, there were no negotiations regarding the lease between the parties. As of July 10, 1978, Jahnke was fully aware of the nematode problem connected with the Beaver Creek Ranch. On that date Jahnke met with Devine and Devine offered to give Jahnke a credit for the loss of certification equal to the extra cost of planting virus-tested seed—the same credit offered to other Beaver Creek tenants. Although the lease was not signed at that time and Jahnke stated he would not accept the proposed credit, Jahnke conceded that with knowledge of the problem, he entered into a landlord/tenant relationship with Beaver Creek on July 10, 1978. He thereafter continued his farming operations on Beaver Creek Ranch and voluntarily refrained from seeking certification for the potatoes he was raising. Although Beaver Creek requested Jahnke and its other tenants to refrain from seeking certification for their potatoes, Beaver Creek made no attempt to legally force Jahnke or the other tenants to do so. Evidence adduced at trial demonstrated the extra cost to Jahnke of planting virus-tested seed on the leased property was $5,130.

There being substantial and competent evidence to support the trial court's finding that the parties agreed, expressly or impliedly, that Jahnke's credit for the loss of certification would be $5,130, the judgment of the trial court is *affirmed*.[3]

Costs to respondents.

DONALDSON, C.J., BAKES, J., and SCOGGIN, J., Pro Tem., concur.

SHEPARD, J., concurs in result.

2. The trial court found that the entire proposed lease was not binding upon the parties, but that many of the terms contained therein had been agreed to orally by the parties.

3. The foremost lesson to be learned in this case is more on the economic side than on the legal side. Potato farmers can and often do suffer disastrous losses. Here the record demonstrates that due to over-production the price for uncertified potatoes was extremely low. Ac-

cordingly, Mr. Jahnke, who lost money on his sharecropping arrangement, has suggested that the theory of unjust enrichment should accord him some relief from the owner. However, with the owners also suffering proportionate losses, it is not really a case of the owners being enriched at Jahnke's expense—rather, perhaps a case of "unjust" market conditions coupled with "unjust" threatened potato disease causing losses to both parties.